IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
**Alexandria Division**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Case No. 1:12CR62 |
| | ) | Hon. Anthony J. Trenga |
| AMY HUNTER, | ) | Court Date: May 23, 2013 |
| | ) | |
| Defendant. | ) | |

### DEFENDANT'S POSITION ON SENTENCING FACTORS

Amy Hunter is before the Court as a result of conduct which led to the tragic death of C████ P██████. Through therapy and counseling, Ms. Hunter is learning to understand the confluence of circumstances that provide context for her offense — ████████████████ ████████████████████, her isolation for the first time from her family in Washington State, the sleep deprivation that exacerbated her fragile psychological condition, and her failed attempt to extract herself from the responsibility of caring for a child in addition to her own. This case is heart-breaking not only because no amount of punishment will bring C█████ back, but also because there is little if any risk of future misconduct to be deterred, and because the circumstances that surrounded the commission of the offense will never occur again.

Ms. Hunter, as evidenced by her inconsolable reaction when she learned about C█████'s condition from law enforcement, is consumed by remorse. However, since she has been reunited with her family in Washington she has begun to emerge from ████████████████████ ████████████████████. She is also learning to cope with how her actions will affect her own children, who have been abandoned by their father and must now experience separation from their mother. In this difficult and unique case, a just and appropriate sentence requires the Court to look forward at the impact of its sentence as much as it looks back to the offense itself, and for

that reason we respectfully request that the Court impose a sentence of five years of imprisonment.

**ARGUMENT**

**I.      The Sentencing Factors and the Sentencing Guidelines**

Ms. Hunter has no objections to the Presentence Report at this time.  Likewise, Ms. Hunter has no objections to the Guidelines Calculations at this time.

To be clear, however, the Guidelines should have very little bearing in this case.  The Sentencing Guidelines are designed to address "run-of-the-mill," *United States v. Booker*, 543 U.S. 220, 235 (2005), or "mine run" cases.  *Rita v. United States*, 551 U.S. 338, 351 (2007). There are no run-of-the-mill cases involving the charged offense, and as discussed below the guidelines take no account of the unique circumstances in this case.

Nonetheless, while the Court must consider the advisory sentencing guideline range, the Sentencing Reform Act, 18 U.S.C. § 3551, contains an "overarching provision" that district courts must impose sentences "sufficient but not greater than necessary" to accomplish the sentencing goals set forth in 18 U.S.C. § 3553(a)(2). *Kimbrough v. United States*, 552 U.S. 85, 101 (2007).  These statutory sentencing goals include retribution (to reflect the seriousness of the offense, to promote respect for the law, and to provide "just punishment"), deterrence and incapacitation ("to protect the public from further crimes"), and rehabilitation ("to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner").

In designing a sentence designed to meet those goals, however, the Court must "consider every convicted person as an individual and every case as a unique study in the human failings

that sometimes mitigate, sometimes magnify, the crime and punishment to ensue." *Gall v. United States*, 522 U.S. 38, 52 (2007) (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996)). Accordingly, section 3553 directs courts to consider:  (a) the nature and circumstances of the offense and the history and characteristics of the defendant, (b) the kinds of sentences available, (c) the guideline range, (d) the need to avoid unwarranted sentencing disparities, (e) the need for restitution, and (f) the need for the sentence to reflect the following: the seriousness of the offense, promotion of respect for the law and just punishment for the offense, provision of adequate deterrence, protection of the public from future crimes and providing the defendant with needed educational or vocational training, medical care, or other correctional treatment. *See* 18 U.S.C. § 3553(a).

**II.    In consideration of all the factors, a sentence of 60 months of incarceration is appropriate.**

**A.    A sentence of 60 months of incarceration is appropriate, given the nature and circumstances and the seriousness of the offense.**

On April 26, 2011, Amy Hunter was isolated, deprived of sleep, overwhelmed by caring for two infants, ███████████████████████████. ██████████████████████ ████████████████████████████████████████████████.

Amy Hunter lived with her parents for the first 22 years of her life.  PSR ¶ 45.  She enjoyed an incredibly close relationship with her family — both her parents and her sisters. *See* Attached Ratte Letter, Attached McGrath Letter, Attached M. Trembath Letter.  She did not attend college, and so the first time she moved out of the family home was when she married her husband.  Shortly thereafter, she and her husband, Michael Hunter, moved across the country to Virginia. PSR ¶ 45.  Suddenly, this very young and naive woman found herself on the other end

of the country from her support system, with her husband as her only family within 3,000 miles. Unfortunately, Mr. Hunter did nothing to alleviate the sadness Amy felt, but rather compounded her misery.

After their move to Virginia, Mr. Hunter's personality changed.  He became distant from Ms. Hunter and short with her. *See* Attached DeCamp Letter*, PSR ¶ 53. ▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Ms. Hunter's ████████████ continued to be evident as she was also unable to remove herself from the overwhelming responsibility of caring for two infants. In June 2010, Amy gave birth to her first child. PSR ¶ 49. Approximately 4 months later, she began caring for C████ P██████, as well as her own daughter of nearly identical age. PSR ¶ 20. Understandably, the situation was difficult for her to manage as she was single-handedly caring for two very young children for most of the day. The situation became unmanageable when Amy became sleep deprived. Around March 2011, Michael Hunter began working an evening shift, as well as traveling for work. In her attempt to maintain their marriage, Ms. Hunter wished to spend as much time with him as possible. This meant being awake in the late and early hours so that she would be awake when he left for and returned home from work. Ms. Hunter's obligations to her daughter and to care for C████ P██████, however, were not reduced and indeed were complicated, as she now had to try and keep the household quiet, so her husband could sleep. During the month of April 2011, some nights Ms. Hunter was sleeping as little as 1-2 hours per night. Patton Report at 3. As she became more and more overwhelmed, she tried to convey her distress and asked to withdraw from caring for C████ P██████. Patton Report at 3, Government's Discovery at AH-000231.[1] Unfortunately, the Petersons were unable to find a replacement child care situation. As a result, Ms. Hunter continued to care for both children, becoming more and more overwhelmed as time went on.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

---

[1]    Copies of the government's discovery are not attached hereto, but can be provided to chambers upon request.

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████

████████████████ All of these factors contributed to Ms. Hunter's atypical and aberrant state of mind on the date of the offense. The Amy Hunter who left Washington was a happy, nurturing supportive, if naive, girl. Sadly, on the date of the offense, Amy Hunter was suffering from a combination of ████████████████████████████, isolation, sleep deprivation, and overwhelming stress from her failing marriage and the charge of caring for two infants daily.

What resulted was a terrible act born out of one moment in time.[2] Amy Hunter acted recklessly and in a fragile state of mind in response to a crying child, not out of animosity toward C████. Moreover, as Dr. Scheller notes, C██████'s death was caused by malignant swelling that does not commonly result from the blow and fracture that she sustained. That the severity of the harm to C█████ is a relatively uncommon consequence of her fracture is consistent with the degree of shock that Ms. Hunter experienced upon learning of the severity of C██████'s injuries.

Ms. Hunter's crime, unlike most criminal cases before the court, had no purpose and no rational goal. It is understandable only through the lens of Ms. Hunter's declining emotional

---

[2]    "C██████ suffered a blow to the back of the head . . . . [which] caused an occipital skull fracture and triggered an uncommon complication - malignant brain swelling. This brain swelling led to her death. . . . . There is no other evidence, however, that C█████ was abused . . . on April 26. She had no external signs of trauma, [and] her neck CT scan was normal. C██████'s cervical, lumbar and thoracic micro hemorrhages are not evidence of abuse, rather they are a common complication of severe brain swelling and intensive care treatment. C█████'s bilateral retinal hemorrhages are not evidence of abuse. They are a common complication of severe brain swelling." *See* Attached Report of Dr. Joseph Scheller at 2.

state.  The offense is the consequence of Ms. Hunter's actions, but her conduct in that one moment does not represent the measure of Ms. Hunter's character.

**B.      The advisory guideline range fails to account for the circumstances of this case and therefore does not recommend an appropriate sentence.**

The guideline range as currently calculated fails to recommend an appropriate punishment for several reasons.  To begin, the guideline range considers no mitigating facts related to the offense itself.  Section 2A1.2(a) of the U.S. Sentencing Guidelines provides a base offense level of 38 and no enhancements or reductions. U.S.S.G. §2A1.2.  Not only does the guideline not permit a reduction for a defendant who might be less culpable, it also includes no enhancements to distinguish defendants who might be more culpable.  Despite the vast range of offenses that could constitute second degree murder, the guideline provides one offense level for all such offenses.  On its face, then, the guideline simply cannot recommend an appropriate sentence in each case.  It does not consider that, on the date of the offense, Ms. Hunter was isolated, exhausted, ████████████████████████, and wholly overwhelmed.

Compounding the failure of the guidelines to consider any mitigating factors, or lack of aggravating factors, is that the guideline does apply an enhancement based upon a single aggravating factor: the 2-level enhancement for a vulnerable victim under §3A1.1(b)(1).  In short, while the guideline rightly considers the fact that the victim in this case was a young child, it wrongly fails to consider any of the many mitigating elements in play on that day. Accordingly, while the guideline range fails to provide a sound gauge of punishment in any case, it certainly fails in the context of the complex set of circumstances at issue in this case.

It is also evident that there is no magic to the advisory sentencing range.  Prior to the November 2004 Amendment, the base offense level under § 2A1.2 was 33, five levels lower than

it is today.  As such, defendants whose offenses occurred prior to the amendment who accepted responsibility for causing the death of another while engaged in conduct that was "reckless and wanton and a gross deviation from a reasonable standard of care, . . . [while] aware of a serious risk of death or serious bodily harm," *United States v. Fleming*, 739 F.2d 945, 947 (4th Cir. 1984), faced mandatory guidelines of 97-121 months in criminal history category I.  See U.S.S.G. Appx. C, amend. 663 (effective Nov. 1, 2004).  Given the unique circumstances of this case, Ms. Hunter's exposure to a far more severe guideline range than that faced by equally or even more culpable defendants during the eighteen years that followed the enactment of the Sentencing Guidelines illustrates the arbitrariness of the use of guidelines as a proxy for the identification of a just sentence.

> **C.     A sentence of 60 months of incarceration will promote respect for the law and serve to deter Ms. Hunter.**

While there is no question that a prison sentence will be imposed in this case, such a sentence is not necessary to accomplish the goal of deterrence.  Amy Hunter is overwhelmingly and genuinely remorseful for the loss of C█████ P█████.  Her remorse was evident from the first moments after the offense.  Even as the first individuals were arriving to her home, Ms. Hunter was distraught and nearly catatonic.  Government's Discovery, Bates Nos. AH-409 and AH-412.  Her remorse was further evident the following day, when she was interviewed by law enforcement with respect to the incident.  Upon hearing of the severity of C█████ P██████'s injuries and condition, Ms. Hunter became extremely visibly upset and began to sob uncontrollably.  *See* Docket No. 58, Government's Exhibit 1.  In the weeks after the offense, Ms. Hunter continued to exhibit signs of her emotional devastation at the result of her actions.  ███



Once she is released from prison, Ms. Hunter will still be subject to the restrictions imposed by this Court and by Probation. Ms. Hunter has also fully admitted her involvement in the instant offense, pleaded guilty and admitted her conduct to the Court. PSR ¶¶ 2, 37.

Most notably, there is an incredibly minimal likelihood that Ms. Hunter will ever reoffend. According to Dr. Patton, Ms. Hunter "currently presents a low risk for future danger to others and for committing future criminal acts jeopardizing public safety and security." Patton Report at 9. As the Second Circuit has noted, a defendant who has not previously been sentenced to incarceration, or has been sentenced to minimal incarceration, might very well be deterred by a lesser amount of incarceration than someone who has shown themselves to be undeterred by lengthy sentence. See *United States of America v. Mishoe,* 241 F.3d 214, 220 (2d Cir.2001). Ms. Hunter has never served any period of incarceration. PSR ¶¶ 38-42. A sentence of 60 months, therefore, would accomplish the goal of adequately deterring against future criminal conduct.

Ms. Hunter's great remorse, coupled with her actions since the offense, demonstrate that a lengthy sentence is not necessary to deter Ms. Hunter from violating the law in the future.

**D.      A sentence of 60 months would take into consideration the history and characteristics of Ms. Hunter.**

As detailed above, Amy Hunter was broken, exhausted, ▮▮▮▮ and overwhelmed at the time she committed the instant offense.  The Amy Hunter that left Washington for Virginia, however, is a selfless and loving daughter, sister, aunt and mother.

Growing up, Ms. Hunter was a quiet but typical and responsible girl.  She was liked by her neighbors and she was a popular babysitter. *See* Ratte Letter, Attached Maupin Letter, Trembath Letter.  She was an avid swimmer and a member of the high school swim team.  She successfully graduated from high school.  More importantly, without fail, her family and friends recognized her as someone who was always willing to help others.  Ms. Hunter was known for helping neighborhood kids with their homework, helping swim team members with their form and caring for her neighbor's pets. *See* Maupin Letter, Ratte Letter. When her sisters needed help, "she was right there with a smile on her face, willing to do whatever was needed, this never changed as we grew older no matter how big or small the task, she loved helping others." *See* Attached McGrath Letter.

Ms. Hunter was also a hard worker.  She arrived at Fred Meyer, a department and grocery store, to interview for a job within an hour of talking to the manager who would later hire her.  She was popular with the children she supervised in the playroom there, as well as with their parents, and described by her supervisors as "cheerful" and "dependable". *See* Attached Pereira Letter.  She worked her way up to a cashier and eventually to a "person in charge." *Id.* Amy Hunter was talented at baking and making candy and aspired to own a bakery. *See* Maupin Letter.  Unfortunately, her life took another turn.

In September of 2006, Ms. Hunter and Michael Hunter began dating, after meeting while

working at Fred Meyer. *See* DeCamp Letter, PSR ¶ 45.  Within a few months he joined the

Marine Corps and began his training. In April 2007, he and Amy were engaged and in December

2007, they were married. *Id.*  At the age of 22, Amy left her family home for the first time and

moved to Virginia, leaving behind her hometown and the only life she had ever known.  This

would be the hardest period in Ms. Hunter's life, and would result in ████, isolation, █████████,

█████████.

Fortunately, the most important things about Amy Hunter remain the same.  She is still a

devoted aunt, who helped her nieces make cards for their deployed father and flew to Spokane to

help her sister with her older nieces when she had her second and third daughters. *See* M.

Trembath letter, R. Trembath Letter.  Ms. Hunter is still the thoughtful and loyal friend who

never forgets a birthday. *See* M.McGrath Letter,  Ratte Letter.  Most of all, she is a wonderful

mother.  Her family remembers, even before she graduated from high school, that this was her

greatest aspiration and she is now a "fantastic mother," with "beautiful interactions" with her

daughters. *See* R. Trembath Letter, DeCamp Letter.  Even though her husband is in the process of

divorcing her, provides no financial support and has no contact with his children, Ms. Hunter

remains committed to raising her children in a stable and loving home. *See* Maupin Letter,

Attached Amy Hunter Letter.  Significantly, her family remains committed to her.  In the words

of her brother-in-law, "Amy Hunter is and will always be a cherished member of my family who

I will always consider to be one of the most caring, compassionate, and thoughtful people I will

ever know." *See* R. Trembath letter.

To fully understand her history and characteristics, Ms. Hunter would ask the Court to

consider the attached letters from Wendi Maupin, Melissa Trembath, Ronald Trembath, III,

11

Michell McGrath, Linda and Paul Ratte, Nancy DeCamp, Janny Tan, Traci Howard, Sheila Pereira and Amy Hunter.

In sum, the appropriate sentence in this case would be a total period of incarceration of 60 months.  Such a sentence is appropriate given: (1) the unique circumstances surrounding Ms. Hunter's commission of this offense, (2) the depth of Ms. Hunter's remorse, and (3) Ms. Hunter's otherwise exemplary history and characteristics.

## CONCLUSION

Accordingly, for the reasons listed above, Ms. Hunter respectfully asks the Court to impose a period of incarceration of 60 months and to impose no fine due to her indigency.  Ms. Hunter would further ask the Court to recommend a designation to a Bureau of Prisons facility near Longview, Washington, specifically, F.C.I. Dublin, so that she may be close to her family.

Respectfully submitted,
Amy Hunter,
By Counsel,

Michael S. Nachmanoff,
Federal Public Defender


_____/s/_____

Geremy C. Kamens
First Assistant Federal Public Defender
Virginia Bar #41596
Counsel for Ms. Hunter
1650 King St., Suite 500
Alexandria, Virginia 22314
(703) 600-0800 (tel.)
(703) 600-0880 (fax)
Geremy_Kamens@fd.org


_____/s/_____

Nina J. Ginsberg
Virginia Bar #19472
Counsel for Ms. Hunter
DiMuro Ginsberg, PC
1101 King St., Suite 610
Alexandria, Virginia 22314
(703) 684-4333 (tel.)
(703) 548-3181 (fax)
nginsberg@dimuro.com


_____/s/_____

Whitney E.C. Minter
Assistant Federal Public Defender
Virginia Bar #47193
Counsel for Ms. Hunter
1650 King St., Suite 500
Alexandria, Virginia 22314
(703) 600-0855 (tel.)
(703) 600-0880 (fax)
whitney_minter@fd.org

13

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 16, 2013, I will electronically file the foregoing pleading with

the Clerk of the Court using the CM/ECF system, which will then send a notification of such

filing (NEF) to the following:

Patricia Haynes, Esq.
Stacey Luck, Esq.
Assistant U.S. Attorney
2100 Jamieson Ave.
Alexandria, Va. 22314
(703) 299-3700


Pursuant to the Electronic Case Filing Policies and Procedures, a courtesy copy of the

foregoing pleading will be delivered to Chambers within one business day of the electronic

filing.

By: _____/s/_____
Whitney E.C. Minter
Virginia Bar Number 47193
Attorney for Amy Hunter
Assistant Federal Public Defender
1650 King Street, Suite 500
Alexandria, Virginia 22314
(703) 600-0855 (telephone)
(703) 600-0880 (facsimile)
Whitney_Minter@fd.org (electronic mail)